**Homer L. MAHONE, Plaintiff,**

v.

**Anthony J. CELEBREZZE, Secretary of Health, Education, and Welfare, Defendant.**

**No. 1141.**

United States District Court
S. D. West Virginia,
at Huntington.

Jan. 5, 1963.

Harry F. Thompson, Jr., Huntington, W. Va., for plaintiff.

Harry G. Camper, Jr., U. S. Atty., and George D. Beter, Asst. U. S. Atty., Huntington, W. Va., for defendant.

HARRY E. WATKINS, District Judge.

Plaintiff seeks judicial review of the final decision of the Secretary of Health, Education, and Welfare that he was not entitled to a period of disability and to disability insurance benefits under sections 223 and 216(i) of the Social Security Act, as amended. For the reasons hereinafter stated, it is now found that the decision of the Secretary is supported by substantial evidence and that the defendant's motion for summary judgment should be granted.

On August 18, 1959, plaintiff filed an application to establish a period of disability and for disability insurance benefits in which he alleged that he became unable to work in May, 1958 (which date was later corrected to May, 1959) because of hypertension, heart condition, goiter, and ankle weakness. At the time of the application he was 53 years of age. This application was denied by the Bureau of Old-Age and Survivors Insurance both initially and upon reconsideration. On April 25, 1962, a hearing examiner of the Office of Hearings and Appeals also found that plaintiff was not entitled to a period of disability and to disability insurance benefits. This decision became the final decision of the Secretary when the Appeals Council denied plaintiff's request for review on June 15, 1962.

Section 216(i) of the Act provides for eliminating from a person's earning record the period during which he was under a disability in computing his average monthly wage upon which the amount of his benefit is based. A discussion of the elements of this statutory disability is contained in Pruitt v. Flemming, S.D. W.Va., 182 F.Supp. 159. There is no dispute here concerning plaintiff's "insured status" under the Act. Plaintiff met the requirements of his "insured status" at the time of his application, August 18, 1959, and continued to meet them through March 31, 1961.

■ In order to meet the statutory definition, plaintiff had to establish that he had been continuously precluded from engaging in any substantial gainful activity by a disabling impairment which commenced no later than August 18, 1959, the date on which he filed his application.

At the outset it should be observed that plaintiff ceased working in March, 1958, not because of his physical condition, but because of a "cut off" or a "lay off" occasioned by a reduction of the work force at the mine at which he was employed. In fact, the record indicates that he had lost all of his jobs since about 1956 because of lay offs. After his lay off in 1958, plaintiff received unemployment compensation benefits for approximately twelve months, according to plaintiff's own testimony before the hearing examiner. There is also evidence that plaintiff was accepted for vocational rehabilitation in January, 1961, but the Vocational Agency lost contact with him because he did not respond to their correspondence.

The plaintiff has worked in the mines since he was twelve years old. During this period he has performed almost every mine job. At the time that he was laid off in 1958, he was a mine foreman and had been for 15 years. His job required practically no exertion. His formal education is limited to three years, but he feels that he now has the equivalent of a tenth grade education.

■ The evidence is clear that plaintiff is suffering from certain impairments, but this evidence is conflicting as to the nature and extent of these impairments. Congress has delegated to the Administrative Authority the duty of resolving such conflict, and the courts may not reverse such finding if there is substantial evidence to support it. The medical evidence does demonstrate the presence of hypertension. Plaintiff indicated that this has been present since 1954. However, the hearing examiner found that the medical evidence does not show that the hypertension has caused adverse effects on the heart, kidneys, or eyes. There is substantial evidence to support such finding.

Although the evidence is conflicting, the hearing examiner found that the more persuasive evidence indicates that plaintiff's heart was essentially normal. Dr. W. B. Ebert in an examination made in February, 1960, shows that plaintiff's heart rhythm was regular and the sounds were of fair quality. There was no ankle swelling or other indicia of a heart disturbance. The electrocardiogram was normal, and the chest X-ray showed a heart of normal size. He made no diagnosis of any heart condition. Dr. W. E. Bray, Jr.'s examination of September 23, 1960, showed that plaintiff's heart was normal and not enlarged. He had not only given plaintiff an electrocardiogram, but also a chest X-ray. He concluded that plaintiff was not disabled by any organic disease. Dr. R. A. Salton in an examination made in September, 1961, found plaintiff's "cardiac silhouette to be of normal size and contour." For a person of plaintiff's age the chest X-ray was normal. Dr. E. T. Drake in February, 1962, found plaintiff's heart regular with no murmurs or enlargement. Dr. Drake, however, found plaintiff's blood pressure to be 220/112. His opinion was that plaintiff was not then able to work (February, 1962), but "that with adequate medical management he would be able to resume light to moderate work within a period of two months."

Plaintiff testified before the hearing examiner that he had had a goiter (enlarged thyroid) since he was a child and had never taken any medication for that condition. Dr. Bray concluded after tests that the goiter was non-toxic (harmless or benign) although he and Dr. R. E. Evans were of the opinion that the thyroid should be removed surgically.

There is much medical evidence concerning plaintiff's assertion of ankle weakness. Without setting out all of that evidence here, suffice it to say that there is much evidence that plaintiff's orthopedic condition or status was good. Dr. Ebert in an evaluation made in Feb-

ruary, 1960, found (1) good muscle power, (2) no atrophy or fibrillation (tremor), (3) no ankle swelling, and (4) full range of motion in the upper and lower extremities. X-rays of the ankles and feet were essentially normal. Dr. A. E. Levy noted a minimal deformity at the end of the tibia and stated that it would have no effect on function. This report was made on February 17, 1960. Dr. A. A. Grebe reported on June 14, 1960, that plaintiff moved about freely and did not appear to be acutely ill. His examination of the neck, upper back, and low back disclosed no restrictions in movement and all movements were made without discomfort. There was no muscle spasm in the back and no tenderness. There was no limitation of motion or swelling in the ankle joints. Dr. Grebe concluded that:

> "It will be noted from the above that the patient's symptomatology is virtually all subjective in nature. There is little from an objective point of view to make me think that this man is seriously handicapped insofar as his musculoskeletal system is concerned."

This court has considered not only the medical evidence discussed above, but also all other medical evidence of record. Due consideration has similarly been given to plaintiff's subjective testimony and the testimony of other witnesses. Since, on the basis of all evidence of record, there is substantial evidence to support the Secretary's decision that plaintiff is not entitled to disability insurance benefits or to a period of disability, and since plaintiff has failed to meet the criteria set forth in Underwood v. Ribicoff, 4th Cir., 298 F.2d 850 (1962), for establishing the existence of a disabling impairment or impairments on or before August 18, 1959 (the date on which plaintiff filed his application) within the meaning of the Act, defendant's motion for summary judgment is granted.